IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF HARLEY W. & JAXEN W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HARLEY W. AND JAXEN W.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TABITHA S., APPELLANT, AND JAMES W., APPELLEE.

Filed April 14, 2020.    No. A-19-1007.

Appeal from the County Court for Otoe County: ROBERT B. O'NEAL, Judge. Affirmed.

Angela M. Minahan, of Reinsch, Slattery, Bear, Minahan & Prickett, P.C., L.L.O., for appellant.

Sarah G. Wiltse, Deputy Otoe County Attorney, for appellee State of Nebraska.

Timothy S. Noerrlinger, of Naylor & Rappl Law Office, for appellee James W.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

INTRODUCTION

This is an appeal from an order of the Separate Juvenile Court of Otoe County terminating the rights of James W. and Tabitha S. to their children, Harley W. and Jaxen W. We affirm the order of the juvenile court.

- 1 -

## BACKGROUND

Jaxen, born in June 2013, tested positive for methamphetamine at birth. Jaxen was removed from his parents' care, a petition was filed in juvenile court, and Jaxen was placed in foster care. Jaxen was reunited with his parents in February 2016. Harley was born in January 2015 and also tested positive for methamphetamine at birth. Harley was removed from her parents and placed in foster care until reunification in September 2016. From April 2016 through March 2017 there were five intakes filed by the Nebraska Department of Health and Human Services (DHHS) alleging abuse or neglect by the parents. In March 2017, both Jaxen and Harley were again removed from their parents' custody and placed in foster care. On June 21, 2017, both parents admitted to allegations in a new petition filed in juvenile court and acknowledged their children are at risk of harm because they have failed to provide safe and stable housing; they have failed to correct the conditions which led to prior removals of Jaxen and Harley and other children; they engage in domestic violence; they engage in conduct which resulted in their current incarceration; and they both have a history of illegal drug use. On June 15, 2018, the State filed a motion to terminate the parental rights of James and Tabitha alleging that they had failed to correct the conditions which led to the adjudication in June, 2017; that they continuously and repeatedly neglected their children; that their habitual use of narcotic drugs has been found to be detrimental to the children; and that the children have been out of their home for 15 out of the most recent 22 months. A trial on the motion to terminate parental rights was held over 8 days between March 8 and May 22, 2019, in Otoe County.

The court specifically found the State had failed to prove the children had been out of their home for 15 out of the most recent 22 months at the time the motion to terminate parental rights was filed. The court found the State had proven, by clear and convincing evidence, that the elements of Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016) had been met, and that it was in the best interests of the children to terminate the parental rights of James and Tabitha.

Both James and Tabitha appeal the order of the juvenile court and both raise identical assignments of error.

## ASSIGNMENTS OF ERROR

Both James and Tabitha assign that the court erred in finding clear and convincing evidence to support termination of their rights pursuant to § 43-292(2), (4), and (6); that the court erred in finding it was in the best interests of the children that James' and Tabitha's rights be terminated; and that the court failed to make a specific finding of parental unfitness.

We do not reach the parents' assignments that their due process rights were violated or that the court erred in finding the State proved reasonable efforts to preserve and reunify the family since we find the sufficiency of the evidence establishing the grounds for termination enumerated in § 43-292(2) is dispositive of this appeal.

## STANDARD OF REVIEW

An appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court. *In re Interest of Tyler T.*, 279 Neb. 806, 781 N.W.2d 922 (2010). But when evidence is in conflict, an appellate court

considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of Joseph S.*, 291 Neb. 953, 870 N.W.2d 141 (2015). When the parties contest the validity of the evidence presented to the trial court, the reviewing court should give deference to the trial court's determination of the credibility of witnesses. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *Id.*

ANALYSIS

NEB. REV. STAT. § 43-292(2)

Section 43-292(2) allows the court to

[t]erminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection[.]

The neglect and abuse of Jaxen and Harley began at birth and resulted in both of them being removed from their parents and placed into foster care. Both children were removed again on August 2, 2016, and they were both in and out of the home twice more between August and December 1, 2016. On March 3, 2017, within months of their most recent reunification with their parents, Nebraska City Police Captain Lonnie Neeman testified he was notified that James had dropped off Jaxen at his mother's house the day before and had not returned for him. By the next day James' mother needed to go to work and she could not locate either James or Tabitha. Neeman testified he was again contacted by a preschool teacher at Head Start on March 8, who reported Jaxen had been dropped off at the facility but by the end of the day neither James nor Tabitha returned for him. Neeman testified that on both March 16 and 19, he was called to respond to a disturbance between James and Tabitha at a residence in Nebraska City. Sometime between March 19 and 27, James was lodged in the Otoe County jail. On March 27, Tabitha was arrested for driving on a suspended license and during a search of her person and her vehicle, an eighth of an ounce of methamphetamine was recovered. Tabitha was also taken into custody and lodged in the county jail.

Neeman testified now that both parents were in custody, James reached out to one of the officers to report the children had again been left with third party caregivers and had not been retrieved before Tabitha was taken into custody. Neeman testified while voluntarily leaving a child with a third party is not necessarily a bad parenting decision, he was concerned about two things--one, the house where the children were staying was overcrowded with six adults and three

large dogs and the children were dirty; and two, none of the adults in the house had any sort of legal relationship with the children. Neeman testified the "totality of the circumstances" warranted placing the children into protective custody with DHHS on March 28, 2017.

James stayed in jail from March 2017 through the end of the year. By November, he went to substance treatment at Inroads Recovery in Omaha, and after completing treatment in December, he was discharged to a halfway house. James testified he left the halfway house "against medical advice" and stayed with various friends in Wayne and Dunbar. By June 2018 he had returned to Nebraska City and secured a job working for cash as a laborer and he was able to rent an apartment. James started intensive outpatient treatment through Blue Valley at the time of his return and continued to aftercare in August. His attendance was inconsistent and he reported attending only one individual therapy session with his treatment counselor between November and the time of the termination trial. James testified he attended AA and NA meetings through December but by the time of the termination trial he was only attending once per week.

James testified he has not done urinalysis testing for DHHS because his schedule is too erratic. The last test James provided for DHHS was in December 2018 or January 2019. DHHS implemented testing during supervised visits with his children but James acknowledged he missed eight visits between October 2018 and February 2019 due to failed transportation, illness, or seasonal snow removal work. James testified he does not trust DHHS and is reluctant to engage with them.

Tabitha testified she believes she was actually in the Otoe County jail from February 2017, rather than March, through October. When she was released from custody she was put on probation. Tabitha testified she served a "30-day custodial sanction" from April 13 through May 13, 2018, after having overdosed on methamphetamine on April 12. Upon her release from her custodial sanction Tabitha started substance treatment at the Stephens Center in Omaha. Tabitha completed treatment on October 31, and made arrangements to transition to a sober living house but she was discharged for failure to follow the rules. Tabitha decided to go to her mother's home for a month instead, before moving in with James. Tabitha testified she deliberately kept her whereabouts from DHHS. Tabitha testified she is now living in Nebraska City but she refuses to give DHHS her address because "I didn't want them harassing" me and "the city police have harassed me for a long time too, and I didn't want them knowing where I lived." Tabitha is working for cash tearing down old barns and she does not have any pay stubs. She works occasionally and is paid on average $100 per barn.

Tabitha was still on probation from her 2017 incarceration at the time of the termination trial. Tabitha's probation officer testified that Tabitha missed 12 urinalysis tests between March 20 and April 25, 2019. On March 13, Tabitha tested positive for methamphetamine and she acknowledged her use. Tabitha missed a test on March 18. Tabitha was sanctioned and ordered to complete 10 hours of community service by April 15 for the missed test and get an updated substance evaluation from Blue Valley. Tabitha had not complied with either sanction by April 25.

In early 2019, both James and Tabitha missed two out of four family therapy sessions with the children. Tabitha testified there was a misunderstanding about the dates but the therapist testified she had scheduled the sessions with the parents so they should have been aware. Tabitha has missed several Saturday visits with her children because she acknowledges she is "severely

depressed" and some Saturdays she "can't even get out of bed." Tabitha must leave Nebraska City at 7 a.m. in order to arrive at the visitation center in Lincoln by 8 a.m. Tabitha claims she has asked to reschedule the time of the visits or to make up missed visits but she has been told no. James visits with the children on Sundays from noon to 4 p.m.

In its order the juvenile court said "one of its primary questions" was whether the parents have been able to maintain sobriety. James testified part of his rationale for letting Tabitha move in with him after she finished treatment was his desire to "work on" repairing their relationship. He has implemented a "relapse plan" for himself and part of that plan includes avoiding people who continue to use drugs because his "sobriety comes first." Yet the evidence is clear Tabitha has continued to use methamphetamine after treatment; she has been separated from her children while serving custodial sanctions for her continued use and her untreated depression has led to numerous missed visits. When considering all the evidence, the court concluded the State had clearly and convincingly met its burden in establishing the parents continue to neglect the children and they refuse to give them parental support and care.

We find the State has proved by clear and convincing evidence that the numerous intakes and removals of the children, along with Tabitha's continued drug use, the inconsistent visitation and participation in rehabilitative services along with the lack of supervision by both parents, satisfies the elements of § 43-292(2). The parents had not managed to increase their visits beyond once a week and the children had been in foster care since March 28, 2017, after having been returned to their care in December 2016. See *In re Interest of Joseph S.*, 288 Neb. 463, 849 N.W.2d 468 (2014) (evidence of new case opening within 3 months of return of children from prior case, evidence of continued drug use, and lack of supervision makes a prima facie case that requirements of § 43-292(2) are met). We also find that "one's history as a parent speaks to one's future as a parent" and, when considered with evidence of what is in the best interests of the children, we conclude the evidence is sufficient to warrant termination of James' and Tabitha's parental rights. See *In re Interest of Sir Messiah T.*, 279 Neb. 900, 908, 782 N.W.2d 320, 328 (2010).

BEST INTERESTS

In addition to proving a statutory ground for termination, the State must show by clear and convincing evidence that termination is in the best interests of the child. *In re Interest of Aly T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Aly T., supra.* In discussing the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has said "[p]arental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being." *Id.* at 626, 921 N.W.2d at

868. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Aly T., supra.*

The current case manager, Jeff Brown, testified his review of visitation and therapeutic reports revealed a lack of connection between the children and the parents saying it is more a matter of what is not there in the interactions. Brown testified the parents have not inquired about school programs or performance, they have not attended medical appointments, and they have missed family therapy appointments which were designed to work on their disciplinary skills.

The children's therapist, Dru McMillan, testified her specialty is working with children with a history of trauma and attachment issues. McMillan has worked with both children since August 2018 and she has diagnosed Jaxen with post-traumatic stress disorder and Harley with developmental trauma. McMillan testified the repeated removals have impacted Harley's ability to reach milestones and she engages in self-harming behavior to ease her anxiety. McMillan testified Harley picks at the skin on her face above her nose, which bleeds, scabs over, and bleeds again with continued "picking." This behavior in one so young is "very concerning" it is the "outward manifestation of internal turmoil." McMillan describes both children as "dysregulated" or unable to manage their emotions. Harley cries and throws tantrums, she is overly clingy, and wants to sit on the laps of all caregivers. Jaxen "dissociate[s]" or spaces out into his own world. McMillan testified these behaviors are attributable to the trauma of returning home and being removed again due to more neglect. McMillan made progress with the children between August and December 2018, but by December the focus became maintaining progress because the children had become too dysregulated. Missed visits and lack of consistency in parental interaction with the children were cited as barriers to progress. McMillan testified trauma therapy for children has to include the caregivers.

The family therapist, Catherine Niedermeyer, testified she had two sessions with James and Tabitha and both children. For sessions three and four Niedermeyer scheduled the parents separately. Both parents missed their separate sessions.

The parents specifically asked to work on strategies related to discipline. Niedermeyer observed Jaxen down on the floor playing with legos and when James got on the floor to join him Jaxen tolerated the intrusion to his space. Harley was very "clingy" and moved from lap to lap trying to get her parents to interact with her. Instead, the parents were engaged with each other or their phones. Niedermeyer observed Harley calling Tabitha her "visit mom" or "Tab." When Tabitha corrected her, Harley told the therapist "I need my mom" which the therapist interpreted to mean her foster parent. Niedermeyer believes Harley's attachment to Tabitha is "insecure" which is typically caused by disruption or severing of the mother-child relationship during the trust building process between 0 and 2 years of age. Harley was removed at birth and was not returned for 18 months, and then removed again shortly thereafter. Niedermeyer testified Jaxen has "limited attachment" to his parents and only engages with them if they reach out to him. Jaxen is "very content doing his own thing." He does not have an "age-appropriate attachment to his parents." Both therapists testified the children will need to have on-going therapy even after permanency is achieved.

In concluding it was in the children's best interests that James' and Tabitha's parental rights be terminated the court cited the parents' long term addiction and relapses, their inconsistent visits, the trauma suffered by both children related to repeated removals, and their lack of age appropriate bonding with their parents. And we would add periods of incarceration and lack of proof of income as evidence of neglect and the inability to provide parental care and protection as support for the court's finding that termination of parental rights is in the children's best interests. Based upon our de novo review of the record, we find clear and convincing evidence that James and Tabitha are unfit. We also find that it was shown by clear and convincing evidence that termination of James' and Tabitha's parental rights would be in the children's best interests.

BRIEF OF APPELLEE/THIRD-PARTY APPELLANT

James has filed a brief raising the same assignments of error noted by Tabitha since his interests are not adverse to Tabitha's. The State suggests we disregard James' assigned errors because "he failed to comply with the proper filing of a cross-appeal." Brief for appellee at 26.

Once a notice of appeal is filed, all other parties become appellees and can file a cross-appeal. *In re Interest of Steven S.*, 27 Neb. App. 831, 936 N.W.2d 762 (2019). James has designated his brief "Brief of Appellee/Third-Party Appellant." Although James designates himself as a "third-party appellant," he is actually a cross-appellant. We note that "appellant" appears on the cover of his brief and his brief otherwise meets all the criteria for an appellant's brief.

As a cross-appellant, James was required to comply with the rules on cross-appeals, including the requirement that he designate on the cover of his brief that it is a cross-appeal, and set forth his cross-appeal in a separate division of the brief entitled "Brief on Cross-Appeal." See Neb. Ct. R. App. P. § 2-109(D)(4). It is incumbent upon all counsel appearing before this court to be conversant with the Nebraska Court Rules of Appellate Practice regarding the submission of briefs. Nevertheless, the court has the ability to consider a party's cross-appeal, even though the party's brief violated § 2-109(D)(4) requiring a separate section for a cross-appeal, where the form and presentation of the assignments of error in the party's brief conformed with § 2-109(D)(1), which applies to an appellant's brief. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

In this case, James' brief takes the same form as an appellant's brief, he is seeking reversal of a final order, his interests are not adverse to those of Tabitha, and as defined by Neb. Rev. Stat. § 25-1913 (Reissue 2016), he is an appellant. We have waived the requirements of § 2-109(D)(4) as the law allows us to do in order to consider his claims. We are not "cutting back" on the enforcement of the rule, however, and this result might not always be the case. See *In re Interest of Steven S.*, 27 Neb. App. at 868, 936 N.W.2d at 785 (Arterburn, Judge, concurring). Having waived the requirements of § 2-109(D)(4) in this case, we do not find merit in any of James' assignments of error.

CONCLUSION

The order of the juvenile court terminating James' and Tabitha's parental rights is affirmed.
AFFIRMED.